UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DAVID HEFFELFINGER, ANDREW
HINDS AND RODNEY DWYRE, on behalf
of themselves, the general public and all
others similarly situated,

             Plaintiffs,

             vs.

ELECTRONIC DATA SYSTEMS
CORPORATION, a Delaware corporation,
and DOES 1 through 100, inclusive,

             Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 07-00101 MMM (Ex)


ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

On November 28, 2006, plaintiffs David Heffelfinger, Andrew Hines, and Rodney Dwyer filed this putative class action against defendant Electronic Data Systems Corporation ("EDS") in Los Angeles Superior Court, alleging that EDS had failed to pay overtime to certain classes of information technology workers in its California facilities. EDS removed the action on January 9, 2007, invoking federal jurisdiction under the Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 4(a), 119 Stat. 9 (codified in relevant part at 28 U.S.C. § 1332(d)(2)). Plaintiffs allege four state law causes of action: (1) failure to pay overtime in violation of the California Labor Code, (2) failure to provide meal and rest periods in violation of the California Labor Code, (3) collection of waiting penalties for unpaid overtime, and (4) unfair competition in violation of California's Business and Professions Code § 17200. Plaintiffs have now moved for class certification pursuant to Rule 23 of the Federal Rules of Civil

Procedure.

# I. FACTUAL BACKGROUND

## A. Allegations In The Complaint

Plaintiff David Heffelfinger was employed by EDS as a Senior Systems Administrator in California between June 2001 and February 5, 2007.[1] Plaintiff Andrew Hines was employed by EDS as a Senior Systems Administrator/Data Base Administrator in California between June 25, 2001 and May 2007.[2] Plaintiff Rodney Dwyre was employed by EDS as a Systems Engineer and Information Analyst between November 2002 and September 29, 2006.[3] Although not alleged in the complaint, Heffelfinger and Hinds worked at EDS's Seaside facility throughout their employment, while Dwyre worked at a site in Rancho Cordova.[4]

Plaintiffs bring their action on behalf of the "general public" and two classes of similarly situated persons. As alleged in the complaint,

(1) Class A ("the overtime class") consists of "all current and former employees employed within the State of California by [EDS] as Data Base Administrators, Senior Systems Administrators, Systems Engineers, and Information Analysts (hereinafter

---

[1]See Complaint, ¶ 7; Defendant's Compendium of Evidence in Support of its Opposition to Plaintiffs' Motion for Class Certification ("Def.'s Compendium"), Exh. 10 (Declaration of Ralph Nisse in Opposition to Plaintiffs' Motion for Class Certification ("Nisse Decl.")), ¶ 17; Def.'s Compendium, Exh. 1 (Declaration of Karie Dalton ("Dalton Decl.")), ¶ 6 . Heffelfinger was employed at EDS when the complaint was filed. Nisse contends that Heffelfinger resigned in February 2007. (Nisse Decl., ¶ 17.) Heffelfinger's statements regarding the length of his employment are contradictory. On the one hand, Heffelfinger states that he "*was* employed" at EDS. (Declaration of David Heffelfinger in Support of Motion for Class Certification ("Heffelfinger Decl."), ¶ 2.) On the other, he asserts that he was employed "from in or about June 2001 to the present." (*Id.*) The court assumes without deciding that this inconsistency is merely a drafting error, and that Heffelfinger indisputably is no longer an employee of EDS.

[2]Complaint, ¶ 8; Declaration of Andrew Hinds in Support of Motion for Class Certification ("Hinds Decl."), ¶ 2. Hinds was still employed by EDS when the complaint was filed.

[3]Complaint, ¶ 9.

[4]Dalton Decl. ¶¶ 7-9.

referred to collectively as 'Information Technology Workers'), within four years of the filing of this Complaint until the date of judgment, who performed work in excess of eight hours in one day and/or forty hours in one week, and did not receive overtime compensation as required by Labor Code, Section 510, and Wage Order No. 4-2001, Section 3, for the period commencing four years prior to the date of the filing of this complaint and continuing through the date of judgment."[5]

(2) Class B ("the break class") consists of "all current or former employees employed within the State of California by [EDS] as Information Technology Workers, within four years of the filing of this complaint until the entry of judgment, who were not provided a thirty minute meal period after working more than five hours per day . . . and/or who were not provided a ten minute rest period every four hours worked."[6]

Plaintiffs allege that EDS improperly classified members of the overtime class as exempt from state overtime laws.[7] Because of this classification, plaintiffs allege that members of the class "regularly worked more than eight hours a day and/or forty hours a week, without being paid any overtime pay."[8] Plaintiffs also assert that, although members of the break class frequently worked more than 8 hours a day, they did not receive a thirty minute meal period (as required for each five hours worked) nor a ten minute rest period (as required for each four hours worked).[9] Plaintiffs contend that, during the "relevant time period," Dwyre and other members of both classes were terminated by or resigned from their employment with EDS.[10] After they left the company's employ, EDS purportedly failed to pay

---

[5]Complaint, ¶ 14(A).

[6]*Id.*, ¶ 14(B).

[7]*Id.*, ¶ 25.

[8]*Id.*, ¶ 27.

[9]*Id.*, ¶ 35.

[10]*Id.*, ¶ 42.

them the overtime wages or compensation due because of the failure to provide meal or rest breaks.[11]

Plaintiffs contend that putative class members have common claims against EDS arising under, *inter alia*, California Labor Code §§ 201-03, 226.7, 510, and 512, and Wage Order 4-2001.

## B. Plaintiffs' Evidence

Plaintiffs proffer information from EDS's website to explain the nature of the company's work. EDS is a "leading global technology services company delivering business solutions to its clients."[12] It "delivers a broad portfolio of information technology and business processing outsourcing services to clients in [various industries] and to governments around the world."[13] EDS handles the information technology needs of businesses and governments, providing various services from a mix of "onshore, near-shore and offshore locations."[14]

Plaintiffs proffer the declarations of the three named plaintiffs as proof of the type of work done by putative class members. Each plaintiff asserts that during his employment as an information technology worker at EDS, he regularly worked more than eight hours within a workday and/or forty hours within a workweek.[15] Each also states that he observed other information technology workers regularly work more than eight hours in a workday and/or forty hours in a workweek.[16] Heffelfinger and Hinds assert that they regularly worked four or more hours without a ten minute break and that they observed other information technology workers who did not receive required breaks.[17]

---

[11]*Id.*

[12]Declaration of Mark R. Thierman in Support of Plaintiffs' Motion for Class Certification ("Theirman Decl."), Exh. A at 7.

[13]*Id.* EDS contends that it created the information technology outsourcing industry 45 years ago. See *id.* The company itself was founded by H. Ross Perot. (See Def.'s Compendium, Exh. 2 (Declaration of Jerry Ferguson ("Ferguson Decl.")) at 6.)

[14]*Id.*

[15]See Heffelfinger Decl., ¶ 4, Hinds Decl., ¶ 4; Declaration of Rodney Dwyre in Support of Motion for Class Certification ("Dwyre Decl."), ¶ 4.

[16]See Heffelfinger Decl., ¶ 5; Hinds Decl., ¶ 5; Dwyre Decl., ¶ 5.

[17]See Heffelfinger Decl., ¶¶ 6-7; Hinds Decl., ¶¶ 6-7.

All three plaintiffs contend that during their employment at EDS, they did not spend more than 50% of their time supervising two or more persons.[18] They also proffer job descriptions for the four

---

[18]See Heffelfinger Decl., ¶ 9; Hinds Decl., ¶ 9; Dwyre Decl., ¶ 7. Plaintiffs assert generally that none of the information technology workers in the putative class spent more than 50% of their time supervising two or more persons. (*Id.*) EDS objects to this statement in each of the declarations on the ground that none of the plaintiffs has sufficient personal knowledge to testify regarding the manner in which *all* class members spent their time. It has also filed a motion to exclude or strike portions of the declarations that are not based on personal knowledge. Unlike evidence presented at the summary judgment stage, evidence presented in support of class certification need not be admissible at trial. See *Levitt v. PricewaterhouseCoopers, LLP*, NO. 04 CIV. 5179 (RO), 2007 WL 2106309, *1 (S.D.N.Y. July 19, 2007) (finding a declaration not made on personal knowledge admissible for purposes of class certification because "[o]n its face, Rule 56(e) applies only to affidavits made regarding motions for summary judgment, not motions for class certification"); *Blihovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 618 (W.D. Wis. 2003) ("Although it is true that the report would not be admissible at trial without the testimony of an individual with personal knowledge of the underlying facts, defendants cite no case law requiring that form of proof at the class certification stage"); *Rockey v. Courtesy Motors, Inc*, 199 F.R.D. 578, 582 (W.D. Mich. 2001) ("courts have held that on a motion for class certification, the evidentiary rules are not strictly applied and courts can consider evidence that may not be admissible at trial," citing *Force v. ITT Hartford Life & Annuity Ins. Co.*, 192 F.R.D. 592, 597 (D. Minn. 1999). Nonetheless, plaintiffs bear the burden of establishing that the requirements of Rule 23 are met. See *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 724 (9th Cir. 2007) ("As the party seeking class certification, Lozano bears the burden of demonstrating that he has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)"). "Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996)). Because the court is required to conduct a rigorous analysis, it declines to rely on evidence that is speculative in determining whether it is proper to certify a class. See *Knudsvig v. Espresso Stop, Inc.*, NO. C06-1559RSM, 2007 WL 2253371, *1 (W.D. Wash. Aug. 1 2007) (declining to certify a class where numerosity was dependent on a speculative calculation of the number of employees with valid claims because "[s]uch speculation cannot survive the 'rigorous analysis' that the Court must apply to determine class certification"); see also *Doniger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977) (denying class certification where plaintiff proffered no "articulable facts" and submitted affidavits that were not based on personal knowledge).

Plaintiffs' assertion that no class member spent more than 50% of his or her time supervising two or more persons unsupported and speculative. Plaintiffs contend there are 440 class members who worked in 75 locations throughout California. EDS has proffered evidence that plaintiffs worked at only two of these locations. While plaintiffs may be able credibly to testify to the daily job functions of colleagues with whom they worked or whom they observed at their work sites, they cannot testify reliably regarding the activities of putative class members working at other locations. Therefore, the court sustains EDS's objection to the evidence and grants its motion to strike; the court will disregard plaintiffs' testimony regarding the supervisory responsibilities of all members of the class.

types of information technology positions.[19]   Heffelfinger contends that his

[19]See Declaration of Mark R. Thierman in Support of Plaintiffs' Motion for Class Certification ("Thierman Decl."), Exh. E (Job Descriptions).  The descriptions are:

1)   Data Base Administrator: "under minimal direction, responsible for the design and integrity of data base structures in a multi-user environment.  Develops and enforces data base standards and procedures.  Analyzes data and process requirements.  Leads or participates in logical and physical data base design.  Reviews system and programming designs to ensure efficient use of data base resources.  Maintains control programs required for accessing a data base.  Interfaces with operations data base support group on production problems and data base management issues.  Monitors data base performance statistics and recommends improvements.  Advises systems engineers and updates management on data base concepts and techniques.  Researches new data base technologies."

2)   Senior Systems Administrator: "under broad direction, leads and coordinates the operational support and implementation activities for [client databases].  Assists leadership in determining tactical and strategic direction of the organization as it relates to emerging operational support technologies.  Researches, analyzes, and recommends new operational support technologies, tools, and techniques.  Coaches others on the application of new operational support technologies.  Reviews distributed computing and network designs to select appropriate operational support strategies and ensure efficient use of resources.  Conducts system support design and performance evaluation reviews.  Identifies, develops, and updates operational support standards and procedures.  Participates with corporate strategic planning teams.  Keeps abreast of emerging operational support technologies and industry trends.  Recommends price/performance improvement opportunities."

3)   Information Analyst: "under general direction, conceptualizes, designs, constructs, tests, and implements portions of business and technical information technology solutions through application of appropriate software development life cycle methodology.  Interacts with the customer to gain an understanding of the business environment, technical context and organizational strategic direction.  Defines scope, plans and deliverables for assigned projects.  Collects, identifies, defines and organizes detailed user and information technology requirements.  Coordinates and collaborates with others in analyzing collected requirements to ensure plans and identified solutions meet customer needs and expectations.  Confirms and prioritizes project plans and deliverables with the customer.  Participates in business and technical information technology solution implementations, upgrades, enhancements, and conversions.  Understands and uses appropriate tools to analyze, identify and resolve business and/or technical problems.  Applies metrics to monitor performance and measure key project criteria.  Prepares system documentation.  Establishes and maintains security,

responsibilities as a data base administrator primarily consisted of the duties listed in the job description.[20]  Hinds asserts that his duties as a senior systems administrator were primarily those identified in the job description.[21]  Dwyre likewise asserts that his responsibilities as an information analyst and systems engineer were primarily the duties listed in the job descriptions for those positions.[22]

Citing these job descriptions, plaintiffs contend that EDS wrongly classified these four categories of information technology workers as exempt from overtime compensation, and assert that the positions do not fall within any of California's recognized overtime exemptions.  Plaintiffs contend this is a question that is common to all members of the overtime class they have identified.[23]

---

integrity and business continuity controls and documents.  Participates in special studies, marketing efforts and formal proposals.  Stays current on emerging tools, techniques, and technologies."

4)      Systems Engineer: "Under general direction, develops and maintains data processing applications which meet customer business needs.  Codes, tests and implements computer programs in developmental and maintenance modes. Defines system requirements and priorities with customers and ensures that daily needs are met.  Develops system and programming specifications.  Designs data processing solutions based on business need and technical considerations. Researches and resolves application production problems. Monitors application performance and performs run time improvement functions.  Prepares system documentation."

[20]Heffelfinger Decl., ¶ 8.

[21]Hinds Decl., ¶ 8.

[22]Dwyre Decl., ¶ 6.  All three plaintiffs contend that "[t]he information technology workers employed by EDS in California all essentially performed the same job functions within their job categories, even if the specific job titles were slightly different."  (Heffelfinger Decl., ¶ 11; Hinds Decl., ¶ 11; Dwyre Decl., ¶ 9.)  EDS objects and moves to exclude this testimony on the basis that plaintiffs lack personal knowledge.  As noted, evidence need not be admissible at trial to be considered in deciding a class certification motion.  Nonetheless, the court finds plaintiffs' assertion speculative, at least in part, and unreliable as a result.  Plaintiffs may know that the information technology workers *with whom they worked* "essentially performed the same job functions within their job categories." Plaintiffs do not know, however, whether the same is true of information technology workers employed at facilities where they were not present.  The court declines to rely on plaintiffs' speculative testimony in determining whether a class or classes should be certified.

[23]Plaintiffs rely on the testimony the court has excluded to demonstrate that workers' functions were common across the class.  They also rely, however, on that the fact that all workers in the putative

7

## C. EDS's Evidence

EDS acknowledges that it has classified information technology workers in the four categories identified by plaintiffs as exempt from California's overtime requirements,[24] and that the central question in the case is whether or not this classification is proper. EDS contends that the evidence it has proffered demonstrates that answering this question requires an individualized inquiry regarding each putative class member's employment. Certifying a class or classes, it asserts, would "enmesh the Court in hundreds of minitrials to resolve dissimilar claims."[25]

EDS offers the declarations of multiple employees, who explain the nature of the company's operations in California and allege generally that whether or not information technology workers are exempt from overtime compensation is not subject to common proof. EDS describes its work as "manag[ing] computers, networks, information-processing facilities, and projects for its customers."[26] It has at least 67 facilities in California, which employ anywhere from 1 to 201 information technology workers.[27] EDS's California employees work for a variety of clients, including federal government

---

class share job codes, indicating that they have been assigned a common set of tasks. Consequently, they assert, no individualized inquiry is required. (See Plaintiffs Reply in Support of Motion for Class Certification ("Pl.'s Reply") at 11 ("None of the job duties listed in either the general job codes or the specific job roles within the general job codes provides any basis to support Defendant's argument that the named plaintiffs and putative class members' exempt status must be determined on a employee by employee basis").) Plaintiffs' contention that information technology workers' duties are restricted to those set forth in the job descriptions is supported by EDS's evidence. (See Def.'s Compendium, Exh. 4 (Declaration of Mike Randall in Opposition to Plaintiffs' Motion for Class Certification ("Randall Decl.")), ¶ 8 (noting that it is "atypical" for EDS employees to be asked to perform work outside their job codes).) Thus, although plaintiffs' speculative testimony is inadequate to establish that all workers statewide perform identical or similar functions, the job descriptions proffered by plaintiffs, coupled with Randall's declaration, suffice to show that putative class members likely have common claims.

[24]Def.'s Compendium, Exh. D (Defendant's Answers and Responses to Plaintiff David Heffelfinger's First Set of Interrogatories ("Def.'s Answers")) at 102.

[25]Defendant's Opposition to Plaintiffs' Motion for Class Certification ("Def.'s Opp.") at 2.

[26]Dalton Decl., ¶ 2.

[27]*Id.*, ¶ 4. EDS contends that it has 75 work sites in California employing between 1 and 96 information technology workers. Nine of these are located in Rancho Cordova. (See *id.*) Of the 440 information technology employees identified by EDS, almost half (201) are employed at one of the Rancho Cordova sites. (See Def.'s Answers at 99-101.) EDS's declarants do not differentiate between

agencies, branches of the armed services, banks, airlines and private companies.[28] Workers at different locations are dedicated to different clients. For example, EDS employees at the company's Seaside facility work in a building owned by the United States Department of Defense (DOD) known as the Seaside Defense Manpower Data Center.[29] Of the 300 employees assigned to EDS's Seaside facility, 60 are information technology workers.[30] Employees at Seaside are responsible for a majority of the problem-solving, upgrading, and migration issues associated with DOD's computer network.[31] To reduce costs, DOD requires tight staffing at Seaside. As a result, some Seaside employees are occasionally required to perform work outside their EDS job code.[32] It is atypical for EDS employees to perform work outside their job codes, however, and customers usually do not require it.[33]

Workers at Seaside are divided into teams and assigned to work on different aspects of the DOD

---

Rancho Cordova sites. For example, Sue Quichocho, a Technical Delivery Team Manager for EDS who works in Rancho Cordova, repeatedly refers to the sites in Rancho Cordova as a unitary job location. (See Def.'s Compendium, Exh. 5 (Declaration of Sue Quichocho ("Quichocho Decl.")), ¶¶ 1, 5, 10.) Quichocho states that between 150 and 160 of the information technology employees at Rancho Cordova work on the Medi-Cal account. (See id, ¶ 5.) No single facility listed by EDS employs more than 96 employees. (See Def.'s Answers at 99-101.) The court infers from this that, although EDS operates multiple locations in Rancho Cordova, all Rancho Cordova sites are treated as a single unit. This means that there are only 67 EDS locations in California, with the largest being Rancho Cordova.

[28]Dalton Decl., ¶ 5.

[29]Randall Decl., ¶ 3.

[30]*Id.*, ¶ 7; Def.'s Answers at 99-101.

[31]Randall Decl., ¶ 3.

[32]*Id.*, ¶ 8.

[33]*Id.* There are other ways in which the DOD contract is atypical of the rest of EDS's business. The Seaside site houses a parallel structure of DOD managers and employees, and DOD managers sometimes direct the work of EDS employees. (*Id.*, ¶ 9.) Additionally, because of security concerns, EDS employees at Seaside are not allowed to consult with other EDS employees outside the facility who lack a security clearance. (*Id.*, ¶ 10.) The DOD account is actually a combination of work for seven different military branches or groups; EDS employees working on the account handle data pertaining to 28 million individuals. Given the breadth and variety of the work, the DOD computer network must meet special and sometimes conflicting needs. (*Id.*, ¶¶ 4-5.) As a result, EDS must purportedly "perform a great deal more customization of functions and systems than it typically does for other customers." (*Id.*, ¶ 4.)

account.[34] Each team has a "Team Lead," who is typically an EDS employee in either the "information specialist senior" or "systems administrator senior" job code.[35] Team leads spend more than half of their time managing the team, which includes assigning work and communicating with EDS managers regarding the performance and progress of the team.[36] The specific tasks team members perform vary from project to project and often require the exercise of discretion and independent judgment in approaching and solving a particular problem.[37]

Unlike Seaside, EDS owns its facilities at Rancho Cordova. Employees at Rancho Cordova work for a number of different customers, including Medi-Cal, a state public assistance program.[38] Putative class members with various job titles perform a variety of tasks. Some work in the area of "technical delivery," i.e., modifying and enhancing software to provide functionality beyond that for which the product was originally designed.[39] Others focus on "service delivery," and are responsible for making changes to existing software.[40] Employees are expected to work independently, exercise discretion, and use individual judgment in solving problems presented to them.[41] They spend most of their time performing tasks that are directly related to the central business operations of EDS's customers.[42]

EDS asserts that it has historically maintained a small number of job codes, and that "it still

---

[34]*Id.*, ¶ 20.

[35]*Id.*, ¶ 21.

[36]*Id.*, ¶ 22.

[37]*Id.*, ¶ 12. EDS argues that the nature of System Administrator Seniors' work is especially discretionary because they are involved in "designing system architecture." This requires writing code to accommodate all of the various stakeholders. (*Id.*, ¶ 14.) Database administrators and Information Analysts also have input in designing database architecture. (*Id.*, ¶ 19.)

[38]Quichocho Decl., ¶¶ 2-3.

[39]Def.'s Compendium, Exh. 6 (Declaration of William Lohman ("Lohman Decl.")), ¶ 5.

[40]*Id.*, ¶ 6.

[41]*Id.*, ¶ 8.

[42]*Id.*

relies on broad job codes and descriptions that encompass employees who perform extremely different functions."[43]  As a result, it contends, the job codes describe the work employees are expected to perform only in the most general terms; "[t]he actual work being done . . . var[ies] greatly based upon the work requirement[s], customer needs, the project parameters, and changes in hardware, software and customer needs."[44]

EDS also contends that many employees included in the putative class telecommute from their homes, some from locations outside California.[45]  In addition, over the last five years, at least 125 workers who are members of the putative class have accepted severance packages.  These packages purportedly include provisions releasing EDS from liability for the claims asserted in this action.[46]

## D. Conclusion

The parties agree that EDS treats information technology workers as exempt from California's overtime requirements.  Plaintiffs proffer evidence from which it can be inferred that all information technology workers do similar work, and contend that, whatever the mix of their duties, such workers are entitled to receive overtime.  EDS asserts that each worker's job is unique, and thus that whether an employee is properly exempted from the overtime requirements must be determined on an individual basis.

---

[43]Ferguson Decl., ¶ 6.

[44]*Id.*

[45]Dalton Decl., ¶ 4.

[46]*Id.*, ¶ 10.  The release imposes a "substantial financial obligation" on any former employee who seeks to pursue claims that have been released.  (*Id.*)  Although EDS asserts that 125 workers have signed such releases, it is not clear whether these individuals are included in the total of 440 class members reported by EDS in its interrogatory response.  EDS states that it employed 440 individuals in positions within the putative class in 2006.  (Def.'s Answers at 103.)  It also asserts that it has reached severance agreements with 125 employees over the past five years.  It is not clear what, if any, portion of the 440 workers employed in 2006 reached severance agreements, and to what extent such agreements will reduce the size of the putative class, or require litigation of individualized defenses.  As discussed *infra*, however, it does not appear that there are concerns regarding the numerosity requirement of Rule 23, as 440 is the *minimum* size of the class.

## II. DISCUSSION

### A.    Legal Standard Governing Class Certification

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect the rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D. Cal. 1996) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983)).  Under Rule 23 of the Federal Rules of Civil Procedure, a class "may be certified [only] if the trial court is satisfied after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of the Southwest v. Falcon*, 457 U.S., 147, 161 (1982).  The burden is on the plaintiffs, as the parties seeking certification, to make a prima facie showing that each of the prerequisites set forth in Rule 23(a) has been satisfied, i.e., (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. See, e.g., *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); FED. R. CIV. PROC. 23(a)(1-4).[47]

Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to certification – that the class be ascertainable.[48]  See, e.g., *Lukovsky v. San Francisco*, No. C 05-00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior to class

---

[47]Amendments to the Federal Rules of Civil Procedure took effect on December 1, 2007.  The rules have "been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only."  FED.R.CIV.PROC. 1 (Advisory Committee comment on 2007 amendment).  Because the amendments do not effect substantive changes in the rules, the court cites cases interpreting the old rules in this order.

[48]This is an explicit requirement for maintenance of a class action under California law.  See, e.g., *Lockheed Martin Corp. v. Superior Court*, 29 Cal.4th 1096, 1104 (2003).  To establish that a proposed class is ascertainable, the factors that must be considered are (1) the class definition, (2) the class size, and (3) available means for identifying class members. *Global Minerals & Metals Corp. v. Superior Court*, 113 Cal.App.4th 836, 858 (2003).

certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Auto. A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020, *4 (C.D. Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified. The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)); see also, e.g., *In re A.H. Robbins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) (same), abrogated on other grounds by *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004) ("Before delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class"); *Robinson v. Gillespie*, 219 F.R.D. 179, 183 (D. Kan. 2003) ("In determining whether to certify a class, the court begins with the proposed definition of the class" because "[a]bsent a cognizable class, determining whether Plaintiffs . . . satisfy the other Rule 23(a) and (b) requirements is unnecessary" (internal quotations omitted)); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 346 (S.D. Ga. 1996) ("Before considering the requirements of Rule 23 . . . a court must determine whether a class exists that can adequately be defined. . . . [C]lass definition is an implicit requirement which must be met before a Rule 23 analysis can be undertaken by the district court").

A class is sufficiently defined if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford*, 168 F.R.D. at 347 ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)). "Where . . . a decision on the merits of a person's claim is needed to determine whether a person is a member of a class, the proposed class action is unmanageable virtually by definition." *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1169 (S.D. Ind. 1997); see also *Armstrong v.*

*Chicago Park Dist.*, 117 F.R.D. 623, 626-27 (N.D. Ill. 1987) (a class definition is "self defeating" if "the court is forced to consider the merits of the controversy and to deny [certification] because of an inability to define who belongs in [the class] before there has been a full trial"). The need for a definition that permits identification of members of the class is particularly important where plaintiffs seek certification under Rule 23(b)(3) because of the notice requirements that must be satisfied for such a class. See *O'Connor*, 184 F.R.D. at 319 ("[D]ue to notice requirements, class definitions of actions maintained under Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2)").

Once the court determines that a class is sufficiently ascertainable, it must examine whether the class meets the numerosity, commonality, typicality and adequacy requirements of Rule 23(a). If these prerequisites are met, the court must consider whether the class is maintainable under Rule 23(b). See, e.g., *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)").

Plaintiffs here seek certification under Rules 23(b)(1), 23(b)(2), and 23(b)(3). Under Rule 21(b)(1), a class may be certified if either subsection (A) or (B) is satisfied. Subsection (A) permits certification if "the prosecution of separate actions by . . . individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." FED.R.CIV.PROC. 23(b)(1)(A).

To bring a Rule 23(b)(1)(B) class action, the representative plaintiffs must demonstrate "that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 838 (1999); see also, e.g., *Amchem Products*, 521 U.S. at 614 (noting that Rule 23(b)(1)(B) "includes . . . 'limited fund' cases, [i.e.,] instances in which numerous persons make claims against a fund insufficient to satisfy all claims").

Rule 23(b)(2) authorizes certification where Rule 23(a) is satisfied and the "party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate

14

final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED.R.CIV.PROC. 23(b)(2). A class seeking monetary damages may be certified under Rule 23(b)(2) only where such relief is 'merely incidental to [the] primary claim for injunctive relief.'" *Zinser* 253 F.3d at 1195 (quoting *Probe v. State Teachers' Retirement System*, 780 F.2d 776, 780 (9th Cir. 1986)).

Finally, a class is maintainable under Rule 23(b)(3) where both (i) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (ii) where "a class action is superior to other available methods for fair and efficient adjudication of the controversy." FED.R.CIV.PROC. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citing *Amchem Products*, 521 U.S. at 614-15). The test presumes that the commonality requirement of Rule 23(a) has been met, and examines the "relationship between the common and individual issues." *Id.* In determining superiority, the court must consider the four factors set forth in Rule 23(b)(3): (1) the interest class members have in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy that has already been commenced by or against class members; (3) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and (4) the difficulties that will likely be encountered in managing the suit as a class action. *Id.* at 1190-93.

In deciding whether to certify a class under Rule 23, an inquiry regarding "the merits of the claims is [generally] inappropriate." 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1759 (2006); see also *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Valentino*, 97 F.3d at 1232. Nonetheless, the court may find it necessary to look beyond the pleadings and examine plaintiffs' substantive claims to determine whether the elements of Rule 23 have been met. See, e.g., *Falcon*, 457 U.S. at 160; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (determining whether to certify a class "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action" (internal quotations omitted)); *Hanon*, 976 F.2d at 509 (holding that the court may consider evidence regarding the merits of the claims to determine whether Rule 23 has

been satisfied); *In re Unioil Secs. Litig.*, 107 F.R.D. 615, 618 (C.D. Cal. 1985) ("[N]otwithstanding its obligation to take the allegations in the complaint as true, the Court is at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case").

As the Fourth Circuit recently observed, "[i]f it were appropriate for a court simply to accept the allegations of a complaint at face value in making class action findings, every complaint asserting the requirements of Rule 23(a) and (b) would automatically lead to a certification order, frustrating the district court's responsibilities for taking a 'close look' at relevant matters, for conducting a 'rigorous analysis' of such matters, and for making 'findings' that the requirements of Rule 23 have been satisfied." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004).

**B.     Statutory and Administrative Background of Plaintiffs' Claims**

"California Labor Code § 510 requires overtime pay for any work over eight hours in one workday, over 40 hours in one workweek, or on the seventh day of work in one workweek subject to certain exceptions." *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 241 (C.D. Cal. 2006). The Industrial Welfare Commission ("IWC") is empowered to establish exceptions from the overtime requirements of the Labor Code for "executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment." CAL. LAB. CODE § 515(a).

The IWC has promulgated exceptions in its Wage Order 4-2001.  In order for the administrative exemption to apply,

"[t]he employee must (1) perform 'office or non-manual work directly related to management policies or general business operations' of the employer or its customers, (2) 'customarily and regularly exercise[ ] discretion and independent judgment,' (3) 'perform[ ] under only general supervision work along specialized or technical lines requiring special training' or 'execute [ ] under only general supervision special assignments and tasks,' (4) be engaged in the activities meeting

16

the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage." *Eicher v. Advanced Business Integrators, Inc.*, 151 Cal.App.4th 1363, 1371-72 (2007) (citing 8 CAL. ADMIN. CODE § 11040(A)(2)(a)(I), b, d, f).

This exemption is construed in the same manner as the administrative exemption under the federal Fair Labor Standards Act ("FLSA"). See 8 CAL. ADMIN. CODE § 11040(1)(A)(2)(f). Because the elements of the exemption are stated in the conjunctive, "each of the five elements must be satisfied to find the employee exempt as an administrative employee." *Eicher*, 151 Cal.App.4th at 1372.

There is also an exemption applicable to workers in the computer software field who are paid on an hourly basis if they meet the following criteria: (1) they are primarily engaged in work that is intellectual or creative requiring the exercise of discretion and independent judgment; (2) they are primarily engaged in the application, design, analysis, testing, or creation of computer programs; (3) they are highly skilled and proficient in the theoretical and practical application of specialized information to computer systems; and (4) their hourly rate of pay is not less than a statutorily set minimum which is adjusted yearly to accommodate inflation. See CAL. LAB. CODE § 515.5;8 CAL. ADMIN. CODE, § 11040(1)(A)(3)(h). EDS argues that some portion of the putative class falls under either one or the other of these exemptions.

California Labor Code § 226.7 provides that "[n]o employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission." CAL. LAB. CODE § 226.7(a). The Industrial Welfare Commission (IWC) has mandated that "[e]very employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period." 8 CAL. ADMIN. CODE § 11070 (12)(a). Employers must authorize rest periods at the rate of ten minutes of rest per four hours of total daily work. *Id.* Should an employer fail to provide a rest period, "the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period is not provided." *Id.*, § 11070 (12)(b). The rest requirement is subject to the same exemptions as the overtime requirements discussed above. See *id.*, § 11070 (1)(A) ("Provisions of Sections 3 through 12 of this order shall not apply to persons employed in administrative, executive,

17

or professional capacities").

These employment statutes are remedial in nature and thus exemptions are interpreted narrowly to protect employees. See *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 794 (1999) ("under California law, exemptions from statutory mandatory overtime provisions are narrowly construed"); *Eicher*, 151 Cal.App. 4th at 1374 ("The command to interpret exemption statutes narrowly to protect employees leads us to believe such an expansive interpretation is not appropriate"). Furthermore, reliance on an exemption is an affirmative defense, such that the employer bears the burden of proving that the employee is exempt. See *Ramirez*, 20 Cal.4th at 794-95.

## C.    Ascertainability and Scope of the Proposed Classes

"Although [i]t is not necessary that the members of the class be so clearly identified that any member can be presently ascertained, . . . [plaintiffs] must establish that there exists a legally definable class that can be ascertained through reasonable effort." *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003). As recently explained by Judge Conlon of the Northern District of Illinois:

> "The class description must be sufficiently definite to permit ascertainment of class members, and 'the description must not be so broad as to include individuals who are without standing to maintain the action on their own behalf.' Proper identification of the proposed class serves two purposes. First, it alerts the court and parties to the potential burdens class certification may entail. 'In this way the court can decide whether the class device simply would be an inefficient way of trying the lawsuit for the parties as well as for its own congested docket.' Second, proper class identification insures that those individuals actually harmed by defendant's wrongful conduct will be the recipients of the awarded relief." *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580 (N.D. Ill. 2005) (citations omitted).

See also *O'Connor*, 184 F.R.D. at 319 (a class need not be "so ascertainable that every potential member can be identified at the commencement of the action"; rather, it is enough that the class definition be sufficiently definite "so that it is administratively feasible for the court to ascertain

18

whether an individual is a member").

There is some confusion in the record regarding the class or classes plaintiffs seek to have certified. As noted, plaintiffs identified two classes in their complaint: an overtime class consisting of information technology workers who were not paid overtime for hours worked beyond 8 in a day and 40 in a week; and a proposed break class consisting of information technology workers who were not given mandated rest periods after every four hours worked and 30 minute meal periods after every five hours worked. Plaintiffs argue that all information technology workers are members of both classes. Plaintiffs' own testimony indicates, however, that some members of the overtime class do not claim that they were denied meal and rest breaks. While Heffelfinger and Hines contend they were denied meal and rest breaks, Dwyre does not.[49]

Plaintiffs' notice of motion seeks certification only of an overtime class.[50] It is clear from plaintiffs' memorandum of points and authorities, however, that they also seek certification of the break class.[51] EDS argues that, by omitting any reference to the break class in their notice of motion, plaintiffs have forfeited their right to seek certification of it.[52] See CA CD L.R. 7-4 ("The notice of motion shall contain a concise statement of the relief or Court action the movant seeks"). As discussed *infra*, the court finds that plaintiffs have not satisfied the numerosity, commonality, typicality and adequacy requirements of Rule 23(a) with respect to such a class. Consequently, the court need not consider EDS's procedural argument.[53]

---

[49]See Heffelfinger Decl., ¶ 7; Hinds Decl., ¶ 7.

[50]See Notice of Motion and Motion for Class Certification, ¶ 1; Amended Notice of Motion and Motion for Class Certification, ¶ 1.

[51]Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Class Certification ("Pl.'s Mem.") at 2-3.

[52]Def.'s Opp. at 14 n. 5.

[53]Were it to consider the argument, the court would conclude that plaintiffs' memorandum of points and authorities provided adequate notice that plaintiffs sought to certify the break class. See, e.g., *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 60 Fed. Appx. 87 (9th Cir. Mar. 3, 2003) (Unpub. Disp.) ("Although the plaintiffs' notice of motion for summary judgment and the first order granting summary judgment appear to have inadvertently omitted three RICO claims, the

## 1. The Overtime Class

In their motion, plaintiffs define the classes differently than they did in their complaint. As noted, the complaint defined the overtime class as "all current and former employees employed within the State of California by [EDS] as [information technology workers], . . . who performed work in excess of eight hours in one day and/or forty hours in one week, and did not receive overtime compensation as required by Labor Code, Section 510, and Wage Order No. 4-2001, Section 3."[54] Plaintiffs' motion defines the overtime class as all information technology workers "employed by EDS in the state of California *who were entitled to,* but were not paid, overtime *in violation of* California Labor Code Section 510 and Wage Order No. 4-2001."[55]  As is evident from the highlighted changes, plaintiffs now seek to define the class in terms of workers who were denied overtime in violation of the law.[56]  A class defined in this fashion constitutes an impermissible "fail-safe" class, whose members would be "bound only by a judgment favorable to plaintiffs but not by an adverse judgment." *Adadhunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980); see also *Dafforn v. Rousseau Associates, Inc.*, 1976-2 Trade Cas. (CCH), ¶ 61219, 1976 WL 1358, *1 (N.D. Ind. July 27, 1976) (refusing to certify a class defined as homeowners who had been charged "an artificially fixed and illegal brokerage fee," and reasoning that "[s]ince the proposed class would consist only of those homeowners who paid illegal fees, a jury determination that defendants have charged no such illegal fees would at the same time determine that there was no class"); *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 488 (C.D. Ill. 2007) ("This type of class definition is called a 'fail safe' class because the class definition precludes

---

plaintiffs' moving papers provided clear notice of the claims that were the subject of the motion and specifically referenced the first, second and fourth RICO claims involving the Beverly Hills Outpatient Surgery Center ('BHOSC'), Moreno Valley and Westwood clinics.  In addition, Zilka has not demonstrated how he was prejudiced by any shortcomings in the notice or order").

[54]Complaint, ¶ 14(A).

[55]Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Class Certification ("Pl.'s Mem.") at 2 (emphasis added).

[56]The proposed class definition in the complaint references workers who were not paid overtime "as required by" the Labor Code.  (See Complaint, ¶ 14(A)).  The mere fact that workers must generally be paid overtime does not necessarily restrict the defined class to employees who were improperly denied overtime, however, particularly given that EDS is  asserting an exemption defense.

the possibility of an adverse judgment against class members; the class members either win or are not in the class. . . . The proposed class definition, thus, is improper because the Court cannot enter an adverse judgment against the class"); *Dodd-Owens v. Kyphon, Inc.*, No. C 06-3988 JF (HRL), 2007 WL 420191, *3 (N.D. Cal. Feb. 5, 2007) (striking the words "who have experienced gender discrimination at any time during the applicable liability period" from a class definition on the ground that it created a "fail-safe class").[57]

If plaintiffs' overtime class were certified as defined, and if the court were to determine that EDS's information technology workers were properly classified as exempt, no putative plaintiff would be bound by the judgment because the court would have found that each was not "entitled" to overtime as a matter of law and thus was not a class member. Theoretically, therefore, any or all of the information technology workers could sue in another court on the same claim and escape the bar of res judicata.

---

[57]The Ninth Circuit has not explicitly held that fail-safe classes are precluded. In *Vizcaino v. United States Dist. Ct. for W.D. Wash.*, 173 F.3d 713 (9th Cir. 1999), plaintiff defined members of the putative class as "common law employees." The district court held that it was circular to define a class using a legal conclusion that was essential to an ultimate finding of liability. See *id.* at 722. The Ninth Circuit rejected this reasoning, holding that "[i]t is implicit in the definition of the class that its members are persons who claim to have been (or to be) common law employees who were denied ESPP benefits." *Id.* The court elaborated, quoting with approval a Fifth Circuit opinion holding that membership in a class can be defined in terms of the success of class members' legal claims. See *id.* (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993)). In *Forbush*, defendant argued that plaintiff's class was improperly defined because "the court . . . first [had to] determine whether an employee's pension benefits were improperly reduced before that person [could] be said to be a member of the class." *Forbush*, 994 F.2d at 1105. The court rejected this argument, stating:

"This argument is meritless and, if accepted, would preclude certification of just about any class of persons alleging injury from a particular action. These persons are linked by this common complaint, and the possibility that some may fail to prevail on their individual claims will not defeat class membership." *Id.*

The fact that the Ninth Circuit quoted *Forbush* with approval may call into question cases holding that there is a blanket prohibition against "fail-safe" classes. Neither *Vizcaino* nor *Forbush* directly discussed whether a fail-safe class could be maintained, however. Rather, they considered whether a poorly drafted class definition justified denying certification outright. Given this focus, neither the *Vizcaino* court nor the *Forbush* court addressed the underlying problem raised by fail-safe classes, i.e., that the scope and size of the class is impossible to determine without a final determination on the merits. Maintenance of such a class turns Rule 23 on its head by requiring that the court address the merits of plaintiffs' claims before certifying a class. Here, the court has broad discretion to define an overtime class to avoid the "fail-safe" problem and elects to do so *infra*.

Given the difficulties with the proposed class definition set forth in plaintiffs' motion, the court has discretion either to redefine the class or to afford plaintiffs an opportunity to do so. See *Armstrong v. Davis*, 275 F.3d 849, 871 n. 28 (9th Cir. 2001) ("Where appropriate, the district court may redefine the class," citing *Penk v. Oregon State Bd. of Higher Educ.*, 816 F.2d 458, 467 (9th Cir. 1987)); *Guevarra v. Progressive Financial Services, Inc.*, No. C-05-3466-VRW, 2006 WL 36123742, *3 (N.D. Cal. Nov. 30, 2006) (denying class certification and finding that "[f]or plaintiff to continue her action as a class action, she must redefine her class"); *Legge v. Nextel Communications, Inc.*, No. CV 02-8676DSF(VNKx), 2004 WL 5235587, *17 (C.D. Cal. June 25, 2004) ("While the Court recognizes that it has the authority to redefine the putative classes, or create subclasses, it declines to do so on this record"); *Poulos v. Caesars World, Inc.*, No. CV-S-94-1126-RLH-RJJ, 2002 WL 1991180, *3 (D. Nev. June 25, 2002) ("Even if the district court decides that certification is proper, it is not bound by the plaintiff's description of the class").

It is not apparent from the complaint or subsequent pleadings that plaintiffs truly intend to seek certification of a class of information technology workers who are entitled to overtime as a matter of law. The gravamen of plaintiffs' claim is that *all* information technology workers employed by EDS are entitled to overtime. As a consequence, the new class definition plaintiffs propose appears to be the result of imprecise drafting rather than an attempt to create a fail-safe class. This conclusion is bolstered by the fact that plaintiffs do not expressly repudiate the class definition set forth in their complaint, and by the fact that EDS appears to presume that the proposed class includes all information technology workers – not just those who might eventually be found to be non-exempt. For these reasons, the court will consider the propriety of certifying the overtime class defined in the complaint (with minor alterations).[58] See *Dodd-Owens*, 2007 WL 420191 at *3 (striking language from a class definition that

---

[58]Thus, the operative definition for the overtime class is: "all current and former employees who were employed within the State of California by [EDS] as Data Base Administrators, Senior Systems Administrators, Systems Engineers, and Information Analysts (hereinafter referred to collectively as 'Information Technology Workers') during the period commencing four years prior to the filing of this Complaint and ending on the date of judgment, who performed work in excess of eight hours in one day and/or forty hours in one week, and did not receive overtime compensation as required by Labor Code, Section 510, and Wage Order No. 4-2001, Section 3. . . ." (The court has modified the definition of the class set forth in the complaint slightly to clarify its meaning.)

would have created a fail-safe class where "[t]he Court perceives the basis for Kyphon's concern and does not see any need for extraneous language"). This class is sufficiently ascertainable. EDS can easily identify information technology workers in the four relevant job categories who were employed in California during the period commencing four years before the filing of the complaint and ending on the date of judgment. After identifying these employees, EDS can determine whether any has been paid overtime. Consequently, the court concludes the overtime class satisfied the threshold ascertainability requirement.

### 2. The Break Class

Plaintiffs' complaint defines the break class as "all current or former employees employed within the State of California by [EDS] as Information Technology Workers, within four years of the filing of this complaint until the entry of judgment, who were not provided a thirty minute meal period after working more than five hours per day . . . and/or who were not provided a ten minute rest period every four hours worked."[59] As with the overtime class, plaintiffs' motion offers a different definition of the break class. It state that the class includes all information technology workers "who were not provided a ten minute rest period every four hours worked *as required by Section 226.7 of the California Labor Code and Wage Order No. 4-2001 within three years of the filing of the complaint in this case*."[60] The definition differs from that included in the complaint in that (1) it adds language limiting the class to those who were not provided legally required breaks; (2) it omits any reference to meal breaks; and (3) it changes the class period from four to three years.[61]

Plaintiffs' attempt to certify the break class suffers from multiple problems. Although plaintiffs purportedly seek to certify both an overtime and a break class, they do not differentiate between the two in their pleadings. In discussing numerosity, for example, plaintiffs argue only that there are at least 440

---

[59]Complaint, ¶ 14(B).

[60]Pl.'s Mem. at 3.

[61]Because the court concludes that the break class is not ascertainable, it does not address why plaintiffs shortened the class period to three years. The court does note that plaintiffs adduced no evidence that any of the named plaintiffs were denied meal breaks. This likely explains why plaintiffs limited the break class claim to denial of rest breaks.

information technology workers who are likely in "the class"; they do not specify the class to which they refer.[62]  Similarly, in addressing adequacy of representation, plaintiffs argue that "the interests of the representative Plaintiffs are fully congruent with the interests of the *class*."[63]  In their conclusion, plaintiffs request that "the Court . . . order that th[e] action proceed to be maintained as a class action, and [that] the *proposed class* . . . be certified forthwith."[64]  These are just three examples of a larger pattern in which plaintiffs refer to a single class in lieu of the two classes they have proposed.  Indeed, with the exception of the introduction, plaintiffs' memorandum nowhere indicates that they seek to certify two separate classes.

Other statements in the memorandum also suggest that plaintiffs do not propose two classes, but seek to have a single class certified that will assert both overtime and break claims.  In arguing that the class they seek to have certified satisfies the commonality requirement, for example, plaintiffs assert that "the main issues of overtime and meal and rest period wage law apply to all putative class members."[65]  Plaintiffs similarly conflate the classes when they argue that plaintiffs' claims are typical because "like the rest of the class members, all [information technology workers]. . . were not paid overtime wages for overtime worked and were not provided 10 minute breaks for every four hours worked . . . ."[66]  The same lack of clarity is evident in plaintiffs' argument regarding Rule 23(b)(2), which asserts that the failure to pay overtime wages and the failure to provide breaks are "actions challenged on grounds virtually identical throughout the class."[67]  Thus, while plaintiffs seek to certify two classes, they argue only in favor of certifying one.

From the evidence in the record, it does not appear that the two proposed classes are identical.  First, as noted, the overtime class is limited to information technology workers who worked overtime.

---

[62]Pl.'s Mem. at 14.

[63]*Id.* at 18 (emphasis added).

[64]*Id.* at 24 (emphasis added).

[65]*Id.* at 17.

[66]*Id.*

[67]*Id.* at 22.

Plaintiffs have not argued, nor adduced evidence, that *all* information technology workers worked overtime. It is quite possible that there are some workers who were purportedly denied breaks but who did not work overtime. These individuals would be members of the break class but not the overtime class. Further, as noted, Dwyre does not contend he was denied breaks. This indicates that some workers who worked overtime were not denied breaks, and thus would be members of the overtime class but not the break class. Because the two classes are likely composed of different members, the court cannot collapse them into one. Consequently, it must determine whether the members of the break class are ascertainable and whether the class meets the other requirements of Rule 23.

As with the overtime class, the court elects to use the definition of the class found in the complaint (eliminating any reference to workers denied meal breaks). So defined, the court concludes that the break class is ascertainable, if not presently ascertained. As noted, not every potential member of a class need be identifiable at the outset of the litigation. See *O'Connor*, 184 F.R.D. at 319. Heffelfinger and Hinds contend they were denied breaks, and assert that they observed other information technology employees "regularly work[ ] four or more hours without being provided a ten minute break."[68] Not all class members need be ascertained prior to certification of a class; it is sufficient if they are ascertainable "at some point during the case." *Fainbrun v. Southwest Credit Systems, L.P.*, 246 F.R.D. 128, 133 (E.D.N.Y. 2007) (quoting *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 HB, 2003 WL 21659373, *2 (S.D.N.Y. Jul. 15, 2003)). Through discovery or other means, plaintiffs can presumably identify those information technology workers who were not provided rest breaks for every four hours of work and thus who are members of the putative class. See, e.g., *Carlson v. General Motors Corp.*, Civ. a. No. 2-86-2674-a, 1991 WL 90893, *2 (D.S.C. Mar. 14, 1991) ("the court is not prepared at this time to say that the plaintiffs' class definition fails the 'ascertainable with reasonable certainty' test. The discovery under way, and the additional discovery to follow, may provide additional building blocks in plaintiffs' construction of this class action suit"). The court therefore turns to an analysis of the Rule 23 requirements with respect to both the overtime class and the break class.

**D.    Whether Plaintiffs Have Satisfied The Requirements Of Rule 23(a)**

[68]Heffelfinger Decl., ¶ 7; Hinds Decl., ¶ 7.

### 1. The Overtime Class

#### a. Numerosity

Under the Federal Rules of Civil Procedure, before a class can be certified, the court must determine that the class is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] . . . only . . . difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case in evaluating whether the requirement has been satisfied. See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329-30 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20-40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy, MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)). "'Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied.'" *In re HiEnergy Technologies, Inc. Sec. Litig.*, No. CV 08-1226 DOC (JTLx), 2006 WL 2780058, *3 (C.D. Cal. Sept. 26, 2006) (quoting *In re Intermec Corp. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 96, 178 (W.D. Wash. 1991)). Plaintiffs have adduced evidence suggesting that the overtime class consists of at least 440 workers. This number easily satisfies the numerosity requirement of Rule 23.

#### b. Commonality

Commonality requires "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient to satisfy the requirement. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir.1982); accord *Hanlon*, 150 F.3d at 1019 ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y. 1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that the class movant show that a common question of

law or fact exists; the movant need not show, at this stage, that the common question overwhelms the individual questions of law or fact which may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

Plaintiffs identify a number of legal issues that are allegedly common to members of the overtime class. First and foremost, plaintiffs note that EDS has classified all information technology workers as exempt. Even if class members' claims raise individual factual issues, EDS's blanket determination that all information technology workers are exempt from overtime requirements suggests that there are common questions of fact and law across the class. Courts have frequently found "the commonality requirement of Rule 23(a)(2) . . . satisfied where a putative class of employees challenges the employer's classification of those employees as exempt from overtime requirements under state labor laws." *Sepulveda*, 237 F.R.D. at 242 (collecting cases); see *Maddock v. KB Homes, Inc.*, No. CV-06-05241 CAS (JTLx), 2007 WL 2221030, *4 (C.D. Cal. July 9, 2007) (finding commonality satisfied where defendant classified all potential class members as exempt from state law overtime requirements); *Krzesniak*, 2007 WL 1795703 at *8 ("Judges from this district – in recent exempt/non-exempt classification cases involving store manager claims under California law for unpaid overtime and meal and rest period violations – have found sufficient commonality when the following common legal and factual issues were presented: (1) whether the employer properly classified the managers as exempt; (2) whether the managers share similar job duties; and (3) whether the employer violated California Labor Code provisions regarding overtime, meal and rest periods, and wage statements regarding employees' hours of work" (citations omitted)); *Jimenez*, 238 F.R.D. at 248-49 ("several questions relating to the policy of classifying general managers as exempt without an examination of their actual tasks and time spent on those tasks are common questions of law and fact common to the proposed class members"). Although EDS disputes that commonality has been satisfied, its arguments are more properly considered in

assessing predominance under Rule 23(b)(3).[69]  See *In re Wells Fargo*, 2007 WL 3045995 at *4 ("the parties largely conflate the commonality and typicality inquiries with the more exacting predominance inquiry under Rule 23(b)(3)").  Consequently, the court concludes that plaintiffs have satisfied this Rule 23(a) requirement as respects the overtime class.

### c. Typicality

Typicality requires a determination as to whether the named plaintiffs' claims are typical of those of the class members they seek to represent. See FED.R.CIV.PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation and internal quotations omitted).  Typicality, like commonality, is a "permissive standard[ ]." *Hanlon*, 150 F.3d at 1020.  Indeed, in practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Falcon*, 457 U.S. at 157 n. 13.  Typicality may be found lacking, however, "if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation").

EDS argues that the named plaintiffs' claims are not typical of the claims of members of the

---

[69]Similarly, plaintiffs' discussion of commonality in their memorandum and reply is more properly addressed in assessing predominance.  The standard for commonality is lenient and the fact that individual proof will be required does not defeat a finding of commonality.

overtime class for the same reason that commonality is not satisfied – i.e., that putative class members perform widely divergent tasks at a number of different work sites. As noted, this argument is best considered in assessing predominance. Plaintiffs have adduced evidence that all employees in four job categories are classified as exempt. They have also adduced evidence that their job duties are similar to those performed by other putative class members. The fact that plaintiffs' job duties may not be identical to those of other class members does not defeat typicality. Indeed, the Ninth Circuit has instructed that "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Dukes v. Wal-Mart* ("*Dukes II*"), _ F.3d _, 2007 WL 4303055, *10 (9th Cir. Dec. 11, 2007) ("Some degree of individuality is to be expected in all cases, but that specificity does not necessarily defeat typicality"); *Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

EDS identifies no unique defenses that might render the named plaintiffs' claims atypical. Cf. *Hanon*, 976 F.2d at 508 ("a named plaintiff's motion for certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it").[70] Nor does it cite factors that render their claims "so unique . . . that litigation of the action is likely to be overwhelmed by addressing [their] individual claims." *Gartin v. S&M Nutec LLC*, No. CV 06-2747SVW (PLAx), 2007 WL 1424654, *4 (C.D. Cal. Apr. 4, 2007). Therefore, the court concludes that plaintiffs "possess the same interest and suffer[ed] the same injury" as the proposed members of the overtime class, and that they satisfy Rule 23(a)'s typicality requirement. See *O'Connor*, 180 F.R.D. at 372.

### d. Adequacy of Representation

The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

---

[70]EDS does raise the specter of workers who signed releases or who worked from a home out of state. Heffelfinger, Hinds and Dwyre do not fall into either category. Thus, their claims are not atypical.

behalf of the class?" *Hanlon*, 150 F.3d at 1020. EDS challenges the adequacy of Heffelfinger, Hinds and Dwyre as plaintiffs because "they were employed at only two of the 75 EDS California job sites, and different practices exist at each site[. Therefore, EDS asserts,] plaintiffs cannot adequately represent employees from other EDS locations."[71] This claim is undercut by the fact that the named plaintiffs worked at two of the largest EDS sites in California.[72] At least one of the three plaintiffs worked with more than half of all members of the putative overtime class.

More fundamentally, however, EDS misconstrues the standard governing adequacy of representation. The fact that plaintiffs may not have firsthand knowledge of practices at EDS facilities throughout the state does not suggest that they will "have . . . conflicts of interest with any of the putative class members [or that they] will [not] prosecute this action vigorously on behalf of the class." *Jimenez*, 238 F.R.D. at 248. EDS proffers no evidence suggesting that plaintiffs' attorneys are not competent or that the class representatives have interests in conflict with other putative class members. Having reviewed the evidence presented by plaintiffs, the court finds that there are no apparent conflicts between plaintiffs and other members of the putative overtime class, and further finds that plaintiffs' counsel is competent. Therefore, the court finds that Heffelfinger, Hinds and Dwyre will be able adequately to represent the overtime class.

## 2. The Break Class

Plaintiffs have adduced no evidence indicating that the break class satisfies the numerosity, typicality, commonality and adequacy of representation requirements of Rule 23(a), nor have they argued the matter. A class can only be certified if "the district court is satisfied 'after a rigorous analysis' that the prerequisites of Rule 23(a) have been met." *Lozano*, 504 F.3d at 730. Because plaintiffs make no showing that the break class meets the requirements of Rule 23(a), the class cannot

---

[71]Def.'s Opp. at 18.

[72]As noted, considering Rancho Cordova as a single site, there are only 67 job sites in California. Rancho Cordova accounts for 201 of the putative class members statewide, while Seaside accounts for 60. Rancho Cordova employs far and away the largest number of information technology workers. The only other location larger than Seaside is Folsom, which employs 65 workers. (See Def.'s Answers at 100.) Taken together, the named plaintiffs' two work sites account for 261 of the 440 putative class members (or roughly 59%).

be certified. Consequently, in assessing whether plaintiffs have satisfied the certification requirements of Rule 23(b), the court considers only the overtime class.

### E.    Whether Plaintiffs Have Satisfied the Requirements of Rule 23(b)

Having satisfied the requirements of Rule 23(a), the court must now determine whether the proposed overtime class satisfies the requirements of Rules 23(b)(1), 23(b)(2), or 23(b)(3). Plaintiffs allege that they satisfy all three. The court therefore addresses each subsection in turn.

### 1.    Rule 23(b)(1)

Under Rule 23(b)(1)(A), the court may certify a class if "the prosecution of separate actions by . . . individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." FED.R.CIV.PROC. 23(b)(1)(A). Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Products*, 521 U.S. at 614 (internal quotation marks omitted)); see also *Sueoka v. United States*, 101 Fed.Appx. 649, 654 (9th Cir. May 5, 2004) (Unpub. Disp.) ("To invoke Rule 23(b)(1)(A), plaintiffs must show that there is a risk that defendants' efforts to comply with the judgment in one action will require them to act inconsistently with the judgment in another"). Because courts have found that Rule 23(b)(1)(A) requires more than a risk that a defendant will be forced to pay damages to some parties and not to others, the Ninth Circuit has held that "[c]ertification under Rule 23(b)(1)(A) is . . . not appropriate in an action for damages." *Zinser*, 253 F.3d at 1193.

As a result, certification under Rule 23(b)(1)(A) is appropriate only when the named plaintiffs seek a form of injunctive relief that would bind the entire class. Because plaintiffs are no longer employed by EDS, they lack standing to seek prospective injunctive relief under the UCL. "Where . . . a plaintiff seeks prospective injunctive relief, he must demonstrate 'that he is realistically threatened by a *repetition* of [the violation]." *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001) (alteration original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (holding that a plaintiff on whom police once used a chokehold lacked standing to seek injunctive relief because he failed "to

establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part")).

In the context of a class action, this requires that the representative plaintiff show that he is "personally subject" to the threat of future harm. *Id.*; see also *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("[S]ystem-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class. . . . Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief. Any injury unnamed members of this proposed class may have suffered is simply irrelevant to the question whether the named plaintiffs are entitled to the injunctive relief they seek"); *Huss v. Spokane County*, No. CV-05-180-FVS, 2007 WL 1115296, *2 (E.D. Wash. Apr. 13, 2007) (conceding that an alleged wrong was "likely to recur" because it stemmed from a statute and the County's written policy, but holding that the named plaintiff lacked standing to seek injunctive relief because he could not demonstrate that "he, personally, is likely to be arrested and assessed the [challenged] booking fee again"); *Stevens v. Harper*, 213 F.R.D. 358, 368 (E.D. Cal. 2002) ("In *Hodgers-Durgin* the [Ninth Circuit] held that standing to seek equitable relief was not shown where plaintiffs alleged a single violation and then argued that other members of the class were likely to sustain future injury").

Plaintiffs are no longer employed by EDS and they have presented no evidence suggesting that they intend to seek re-employment. As a result, they do not have standing to request prospective injunctive relief under the UCL; they can only seek restitution in the form of the unpaid overtime wages to which they are purportedly entitled. See *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177 (2000) ("[O]rders for payment of wages unlawfully withheld from an employee are also a restitutionary remedy authorized by [the UCL]. The employer has acquired the money to be paid by means of an unlawful practice that constitutes unfair competition as defined by section 17200. . . . [E]arned wages that are due and payable pursuant to [statutory law] are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice. An order that earned wages be paid is therefore a restitutionary remedy authorized by the UCL").

Restitution, like an injunction, is a species of equitable relief, and is not properly identified as "damages." Although this form of restitutionary recovery is not a "payment of damages," *id.*, it nonetheless "bear[s] some relationship to the historical function of 'damages,' rather than [to] the historical function of 'restitution.'" *Juarez v. Arcadia Financial, Ltd.*, 152 Cal.App.4th 889, 914 n. 14 (2007). As noted, "Rule 23(b)(1)(A) certification requires more [ ] than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts.'" *Zinser*, 253 F.3d at 1193 (internal quotation marks and alteration omitted)). Thus, even though the relief sought is technically restitutionary, it is more analogous to an individual award of damages to each class member than to injunctive relief. The logic of *Zinser* suggests that such individualized monetary awards are not sufficient to justify certification under Rule 23(b)(1)(A), whether they are denominated restitution or damages. Unlike prospective injunctive relief, individual restitutionary awards will not bind EDS to a course of conduct that risks inconsistent future judgments.

In sum, because they cannot seek classwide prospective injunctive relief, and because any restitutionary award they may recover is akin to damages, the court concludes that certification of plaintiffs' proposed class under Rule 23(b)(1)(A) is not appropriate. See *Whiteway v. FedEx Kinkos Office and Print Svcs.*, No. C 05-2320 SBA, 2006 WL 2642528, *8 (N.D. Cal. Sept. 14, 2006) (declining to certify an exemption class under Rule 23(b)(1)(A) where the class sought primarily damages).

Plaintiffs also seek to certify the class under Rule 23(b)(1)(B). They argue that the case presents a "classic situation" for application of the rule.[73] The court disagrees. The Supreme Court has held that, in order to satisfy Rule 23(b)(1)(B), a plaintiff must demonstrate that the case involves a "'fund' with a definitively ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 841 (1999). Plaintiffs have not shown that such a limited fund exists, and the evidence before the court in no way suggests that EDS's ability to pay members of the putative

---

[73]*Id.*

class is limited. Thus, plaintiffs' request for certification under Rule 23(b)(1)(B) fails. See *Whiteway*, 2006 WL 2642528 at *9 (declining certification of an exemption class under Rule 23(b)(1)(B) where plaintiff "has identified no ascertainable limit on any potential fund for payment of damages, punitive or otherwise, aside from pointing out that there are due process limits on the size of punitive damage awards. In the absence of a more complete showing, the Court rejects Plaintiff's argument that the class should be certified under Rule 23(b)(1)(B)").

### 2. Rule 23(b)(2)

To warrant certification under Rule 23(b)(2), plaintiffs must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." FED.R.CIV.PROC. 23(b)(2). Two elements must be satisfied before an action can be certified under Rule 23(b)(2): "(1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class and (2) final injunctive or corresponding declaratory relief must be requested for the class.'" 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1775, at 41 (2005).

A Rule 23(b)(2) class is appropriate "only where the primary relief sought is declaratory or injunctive." *Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003) (quoting *Zinser*, 253 F.3d at 1195). This does not mean that class actions certified under Rule 23(b)(2) *may* not include claims for monetary damages; it requires only that damages "not [be] the 'predominant' relief sought, [and] instead [be] 'secondary to the primary claim for injunctive or declaratory relief.'" *Dukes v. Wal-Mart* ("*Dukes I*"), 222 F.R.D. 137, 171-72 (N.D. Cal. 2004) (quoting *Molski*, 318 F.3d at 947); see also FED.R.CIV.PROC. 23(b)(2), Advisory Committee's Notes (1966) ("The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages"). Unlike classes certified under Rule 23(b)(3), members of a Rule 23(b)(2) class do not have the right to opt out. *Molski*, 318 F.3d at 947. Nonetheless, a district court may exercise its discretionary authority under Rule 23(d)(2) to require notice and the right to opt out. *Id*.

EDS correctly notes that plaintiffs do not seek injunctive relief in their complaint. It also notes that the named plaintiffs are former employees of EDS, such that they do not have standing to seek injunctive relief against the company. See *Kurihara v. Best Buy Co., Inc.*, No. C 06-01884 MHP, 2007

34

WL 2501698, *8 (N.D. Cal. Aug. 30, 2007) ("In the employment context, courts routinely deny class certification under Rule 23(b)(2) where the named plaintiff is a former employee and therefore will not benefit from the requested injunctive relief" (collecting cases)); *Lanzarone v. Guardmark Holdings*, No. CV 06-1136 R PLAx, 2006 WL 4393465, *3 (C.D. Cal. Sept. 7, 2006) ("certification cannot be granted under Rule 23(b)(2) because Plaintiff, a former employee, lacks standing to pursue injunctive relief," citing *Nelsen v. King County*, 895 F.2d 1248, 1254-55 (9th Cir. 1990)); see also *Jimenez*, 238 F.R.D. at 250 (denying certification under Rule 23(b)(2) because "[p]laintiffs are former employees and thus an injunction as to Domino's behavior to current employees cannot be Plaintiffs' primary concern. Rather, a damages award is their main interest"). Just as plaintiffs lack standing to seek injunctive relief, so too do many putative class members, who, like plaintiffs, are former employees.[74] Under these circumstances, the court cannot certify a class under Rule 23(b)(2).

### 3. Rule 23(b)(3)

Rule 23(b)(3) requires two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy. See FED.R.CIV.PROC. 23(b)(3).

### a. Predominance

The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Products*, 521 U.S. at 623-24. If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. *Hanlon*, 150 F.3d at 1022. "'[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'" *Zinser*, 253 F.3d at 1190 (quoting 7A

---

[74]The fact that plaintiffs seek restitutionary relief does not change the analysis. "The distinction made in Rule 23(b)(2) [ ]is not one between equitable remedies and compensatory damages; rather, it is between 'final injunctive relief or corresponding declaratory relief with respect to the class as a whole' and all other forms of relief." *In re Paxil Litigation*, 218 F.R.D. 242, 247 (C.D. Cal. 2003) (quoting FED.R.CIV.PROC. 23(b)(2)).

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535-39 (1986)). This is because, *inter alia*, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

The underlying legal question that plaintiffs seek to litigate on behalf of the proposed overtime class is whether EDS properly classified information technology workers as exempt from California's overtime laws. EDS argues that resolution of the exemption issue will require individualized examination of each employee's circumstances, and thus that individual questions will predominate over common questions. "In the context of overtime pay litigation, courts have often found that common issues predominate where an employer treats the putative classmembers uniformly with respect to compensation, even where the party opposing class certification presents evidence of individual variations." *In re Wells Fargo*, 2007 WL 3045995 at *6 (collecting cases). Other courts have found that individual variations among class members predominate over the common issues in such cases, precluding certification. See, e.g., *Jimenez*, 238 F.R.D. at 251 (denying certification to a class whose members claimed they were improperly classified as exempt on the basis that "individual questions predominate[d]"); *Sepulveda*, 237 F.R.D. at 249 (denying class certification on the basis that "the individual questions predominate[d] over the common issues"). A careful reading of these cases reveals a set of criteria that courts consider in weighing predominance. The court applies these criteria below to the facts of this case.

### (1)    Cases Finding Predominance

A number of courts have found that common issues of fact and law predominate over individual issues in cases where defendants assert a defense of exemption from the overtime requirements of California law. In *Wang v. Chinese Daily News, Inc.*, 231 F.R.D. 602 (C.D. Cal. 2005), plaintiffs sought to certify a class of newspaper reporters and account executives. As a threshold matter, the court found it was appropriate to certify a class under Rule 23(b)(2) because plaintiffs were current employees seeking injunctive relief. It then addressed certification under Rule 23(b)(1). As respects this provision, the court found that the class members' claims presented common legal issues, including: "whether Defendant has a uniform policy of unlawfully treating

36

certain classifications of employees as 'exempt.'. . ." *Id.* at 612-13.  Defendant argued that despite these common questions, the overriding question – whether reporters and account executives were exempt – required an individualized inquiry regarding each employee's job duties.  *Id.* at 613.  The court rejected this suggestion, stating: "Defendant cannot, on the one hand, argue that all reporters and account executives are exempt from overtime wages and, on the other hand, argue that the Court must inquire into the job duties of each reporter and account executive in order to determine whether that individual is 'exempt.'"  *Id.*  This was especially true, the court observed, because plaintiffs challenged defendant's "*policy* of classifying all reporters and account executives as 'exempt.'" *Id.* (emphasis original).

In *In re Wells Fargo*, plaintiff sought to certify a class of Home Mortgage Consultants ("HMCs").  Wells Fargo treated all HMCs as exempt for purposes of paying overtime compensation, contending that they fell into one of seven exemption categories under California law. See *In re Wells Fargo*, 2007 WL 3045995 at *7.  Wells Fargo identified a multitude of factors that distinguished the work individual HMCs performed, including the fact that they worked different hours, spent varying amounts of time in and out of the office, and were paid varying levels of compensation. See *id.* at *1.  The court analyzed the evidence and determined that defendants had raised "serious issues regarding individual variations among HMC job duties and experiences." *Id.* at 11.  It held, however, that

> "common factual and legal issues nonetheless predominate[d] [because] Wells Fargo's uniform policies regarding HMCs weigh[ed] heavily in favor of class certification.  As numerous courts have recognized, it is manifestly disingenuous for a company to treat a class of employees as a homogenous group for the purposes of internal policies and compensation, and then assert that the same group is too diverse for class treatment in overtime litigation." *Id.*

In a case in this district, the court was confronted with a proposed class of general managers of Papa Johns restaurants who were treated as exempt.  See *Alba v. Papa John's USA, Inc.*, No. CV 05-7487 GAF (CTx), 2007 WL 953849, *1 (C.D. Cal. Feb. 7, 2007).  The general managers operated within a standardized and centrally controlled corporate structure. See *id.* at *11.  Although

the managers utilized standardized operating procedures and participated in a uniform training program, defendants argued that each manager's duties were different, and that an individual inquiry regarding the circumstances of each manager was necessary to determine whether he or she was properly classified as exempt. See *id.* at *12. Judge Feess rejected this reasoning, noting that the fact that Papa Johns' operations were standardized and centrally controlled militated in favor of a finding that common questions of fact and law predominated. See *id.* The court also held that "whether store managers [were] 'exempt' [was] a common defense for Defendants in this case, [and] support[ed] class adjudication." *Id.* at 13 (citing *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 490 (E.D. Cal. 2006)). The court relied heavily on *Wang*'s observation that it is inherently unfair for an employer to treat a class of employees as uniformly exempt and then argue that the question of exemption can only be addressed individually. See *id.* (quoting *Wang*, 231 F.R.D. at 613).[75]

A recent case from the Northern District of California suggests, moreover, that the question of predominance turns on the nature of the individualized inquiry that must be undertaken. See *Kurihara*, 2007 WL 2501698 at *9. There, plaintiffs sought to certify a class of Best Buy employees in California seeking unpaid wages for time spent undergoing security checks. See *id.* *1. Although the case did not deal with overtime exemptions, the court reviewed the case law regarding

---

[75]Other courts, too, have relied on *Wang* to certify classes of employees challenging their exempt status. See *Delgado v. Ortho-McNeil, Inc.*, No. SACV 07-263 CJC (MLGx), 2007 WL 2847238, *2 (C.D. Cal. Aug. 7, 2007) (certifying a class under the FLSA in part because "[i]t is somewhat disingenuous, then, for Defendants to argue that they should be permitted to treat all sales representatives as one group for purposes of classifying them as exempt, but that this Court can only determine the validity of that classification by looking to the specific job duties of each individual sales representative," citing *Wang*, 231 F.R.D. at 613); *Krzesniak*, 2007 WL 1795703 at *17 (certifying a class of shift managers who challenged their exempt classification, and citing *Wang*); *Whiteway*, 2006 WL 2642528 at*6 (certifying a class of Kinko's managers and quoting *Wang*); *Tierno v. Rite Aid Corp*., No. C 05-02520 TEH, 2006 WL 2535056, *9 (N.D. Cal. Aug. 31, 2006) (noting that Rite-Aid had always categorized store managers as exempt without making individualized assessments, and that "[g]iven this, Rite-Aid's contention that each Store Manager position must now be individually assessed to determine whether the position can be categorized as exempt or non-exempt rings hollow," citing *Wang*, 231 F.R.D. at 613); see also *Sav-on Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 336 (2004) ("Presence in a particular overtime class action of [individualized considerations] does not necessarily preclude class certification").

predominance in exemption classes thoroughly. After reviewing the cases, it noted that "courts are comfortable with individualized inquiries as to damages, but are decidedly less willing to certify classes where individualized inquiries are necessary to determine liability." *Id.* at *9 (citing cases); but see *id.* ("However, the mere existence of individualized liability issues is not sufficient to warrant denial of class certification"). The court further observed that, even where individualized liability issues were present, courts' discomfort in certifying a class was "assuaged in large part where the plaintiff point[ed] to a specific company-wide policy or practice that allegedly [gave] rise to consistent liability." *Id.* at *10. The *Kurihara* court found that plaintiffs had adduced evidence of a company-wide policy that "form[ed] the bases of the alleged injuries at the center of th[e] action," *id.*, and certified a class.

As can be seen, the courts deciding these cases relied heavily on the fact that the employers designated an entire category of employees as exempt.[76] They concluded that this uniform treatment outweighed any individualized issues of proof that might relevant in assessing whether the exemption was properly applied to individual employees. Underlying the outcome in these cases is the view that it is not fair to permit an employer to determine that a group of employees is uniformly exempt and simultaneously to assert that assessing the legality of that determination requires an individualized, employee-by-employee inquiry.

### (2)    Cases Finding that Individual Issues Predominate

Courts in this circuit are by no means unanimous in finding that common issues predominate in exemption cases, however. Several courts have concluded that, even when a group of employees has been uniformly classified as exempt, individual inquiries required to determine the legality of the classification predominate over the common inquiry.

In *Sepulveda*, a court in this district declined to certify a class of assistant managers (AMs)

---

[76]Several other courts have reached similar results. See *Wamboldt v. Safety-Kleen Sys*, No. C 07-0884 PJH, 2007 WL 2409200, *13 (N.D. Cal. Aug. 21, 2007) (certifying under Rule 23(b)(3) a class of customer sales representatives who shared the same job description and basic job parameters and challenged their exempt status under California's motor-carrier exemption); *Krzesniak*, 2007 WL 1795703 at *20 (certifying a class of shift managers challenging defendants' policy of classifying them as exempt).

at Wal-Mart who alleged that they had been misclassified as exempt. See *Sepulveda*, 237 F.R.D. at 232. The managers were assigned to one area of a Wal-Mart store at a time and their responsibilities varied depending on the employee.[77] *Id.* at 237. Wal-Mart uniformly classified AMs as exempt. See *id.* at 239. Judge Fischer interpreted California law as mandating a two step inquiry whenever a plaintiff sought to challenge his exempt status:

> "Thus *Ramirez* calls for a two-step inquiry. First, the court must examine, in an individualized fashion, the work actually performed by an employee to determine how much of that work is exempt. The trial court must then determine whether the employee's work was consistent with the employer's expectations, and whether those expectations were realistic." *Id.* at 246 (citing *Ramirez*, 20 Cal.4th at 802).

The fact that *Ramirez* directs that there be an individualized inquiry to determine whether an employee is exempt does not automatically defeat class certification. As the court in *Sepulveda* noted, the California Supreme Court held in a subsequent case that "considerations such as 'the employer's realistic expectations' and 'the actual overall requirements of the job' are likely to prove susceptible of common proof." *Id.* (quoting *Sav-On*, 34 Cal.4th at 336-37).[78] Considering *Sav-On* in combination with *Ramirez*, the *Sepulveda* court concluded that under *Ramirez*, the propriety of an exemption always requires an individualized inquiry, but that "if common questions pertaining

---

[77]The court found that some AMs supervised as many as 200 employees while others supervised very few, that some AMs set their own schedules, and that some AMs had authority to make overtime decisions while others did not. See *Sepulveda*, 237 F.R.D. at 237.

[78]The *Sav-On* court noted that requiring a plaintiff to show that all of the members of a putative class are not exempt would impermissibly reverse the burden of proof. *Sav-On*, 34 Cal.4th at 338 ("Were we to require as a prerequisite to certification that plaintiffs demonstrate defendant's classification policy was, as the Court of Appeal put it, either 'right as to all members of the class or wrong as to all members of the class,' we effectively would reverse that burden"). The California Supreme Court also stated that its decision to allow certification of exemption classes was "buttressed" by "sound public policy." *Id.* at 340. It noted that "California's overtime laws [were] remedial and [were] to be construed so as to promote employee protection. . . . [A]s we have recognized, 'this state has a public policy which encourages the use of the class action device.'" *Id.* The Court observed that forcing individual plaintiffs to prove the illegality of the exemption individually would result in a multiplicity of suits bearing on essentially the same question. Although the *Sav-On* Court did not analyze the question of class certification under the Federal Rules of Civil Procedure, it sheds light on the underlying purpose of California's labor laws.

to Defendant's overall policies and practices predominate over the individual question of whether each putative class member was actually non-exempt, then class certification is appropriate." *Id.* at 247.

Applying this standard, the *Sepulveda* court found that the declarations that had been submitted showed that some, if not many, of the putative class members performed primarily exempt tasks. It found that the legality of the exemption turned primarily not on whether a given task or set of tasks was exempt, but rather on "how much time a given AM spent on exempt or non-exempt duties." *Id.* at 249. Although the court declined to certify a class, it acknowledged that classes of exempt workers could be certified in cases that "involve[d] far more standardized work policies, more clearly non-exempt duties, and a smaller number of variable factors" than the case before it. *Id.*[79]

In *Jimenez*, the plaintiffs sought to certify a class of general managers at Domino's Pizza restaurants. Plaintiffs argued that they were improperly classified as exempt in part because they were "primarily involved in performing non-exempt functions." *Jimenez*, 238 F.R.D. at 246. The parties did not dispute that certain tasks performed by plaintiffs were exempt and others were non-exempt. The central issue was how much time each putative class member spent on exempt versus non-exempt tasks. See *id.* at 251 ("Rather, the question presented to this Court is how much time the general managers spent on their various tasks"). Judge Selna distinguished *Sav-On*, concluding that the *Sav-On* Court was presented with the "sweeping issue of how certain tasks should be characterized," while the parties before him agreed on the characterization of the tasks. As a result, he observed, all that remained was an individualized inquiry regarding "the actual mix of duties worked." *Id.* at 252; see *id.* at 253 ("in the present case, there is no question as to whether the tasks performed are exempt or not – rather, as stated previously, the main question is the amount of time

---

[79]The court addressed *Wang*'s fairness point in passing. It noted that Wal-Mart's position was "arguably contradictory" because it treated all AMs uniformly in classifying them as exempt but argued that the question of exemption was individual. *Id.* at 249 n. 15. The court, however, declined to certify a class despite Wal-Mart's contradictory positions. *Id.*

spent on each task").[80]

Still another case from this district dealt with a putative class of commissioned salespersons employed to sell homes. See *Maddock*, 2007 WL 2221030 at *1. Judge Snyder characterized the precedent this way:

> "In similar cases, plaintiffs established the predominance of common issues through the submission of employee declarations demonstrating that all class members share[d] the same finite job duties that [could] then be classified as exempt or nonexempt [citing *Sav-On*, 34 Cal.4th at 331-32,] or evidence that the defendant used a uniform training program to implement standardized operational procedures governing an employee's day-to-day duties [citing *Alba*, 2007 WL 953849]. On the other hand, courts have denied certification of California wage and hour classes based upon a defendant's submission of evidence showing [a] variance in employee duties, and time spent on such duties, depending upon the characteristics of the workplace, the number of employees at that location, the surrounding community, experience of employees, and personal preferences of supervisors [citing *Sepulveda*, 237 F.R.D. at 249; *Jimenez*, 238 F.R.D. at 252; and *Walsh v. IKON Office Solutions, Inc*., 148 Cal.App.4th 1440, 1455 (2007)]." *Id.* at 10.

After examining the evidence presented by the parties, the court determined that each agent's employment duties were distinct. See *id.* at 14. Because of this, the applicability of the exemption turned on the individual details of the employee's employment agreement. See *id.* The court reached this conclusion in part because it found that the putative class members did not all work for the same employer. See *id.* at 15 ("common issues cannot predominate in this case because plaintiff and the other sales agents did not all share the same employer").

Most recently, a court in the Southern District of California declined to certify a class of

---

[80]The *Jimenez* court also distinguished *Romero*'s suggestion that reliance on a common exemption defense weighed in favor of a finding that common issues predominated. It noted that "although Domino's present[ed] a common defense of non-exemption, the defense [was] based on facts that var[ied] from employee to employee." *Jimenez*, 238 F.R.D. at 252.

Home Loan Consultants ("HLCs") who claimed that they were erroneously classified as exempt. *Vinole v. Countrywide Home Loans, Inc.*, _ F.R.D. _, 2007 WL 4112195, *1, 3 (S.D. Cal. Nov. 15, 2007). The court found that plaintiffs had alleged "no common scheme or policy that would diminish the need for individual inquiry." *Id.* at *3. In contrast to decisions certifying exemption classes, the court concluded that "[t]he principal factor in determining whether common issues of fact predominate[d] [was] whether the uniform classification, right or wrong, ease[d] the burden of the individual inquiry." *Id.* at 4. Given the lack of any common policy leading to the classification, the court found that it was not relevant to the issues that had to be decided at trial and thus not relevant in evaluating class certification. See *id.* ("regardless of the number of employees initially classified as exempt, the Court still must undertake an individual inquiry to determine how many HLCs were misclassified for purposes of calculating back pay due and owing"). The court distinguished *Wang*, noting that the class in *Wang* sought injunctive relief against the blanket exemption policy while the parties before it sought only back pay. See *id.* at *3. The court also distinguished *In re Wells Fargo* on the basis that the HLC's job descriptions allowed for individualized choices regarding the duties employees would perform. See *id.* at *4. Ultimately, the court determined that the only way to decide the underlying question of exemption was through an individualized inquiry. See *id.*[81]

### (3) Whether Common Issues Predominate in this Case

After reviewing the cases that have considered the certification of exemption classes, certain common themes emerge. Where the underlying question is whether the tasks plaintiffs perform are inherently exempt, courts have found that exemption is properly treated as a common issue. See e.g., *Jimenez*, 238 F.R.D. at 253; see also *Sav-On,* 34 Cal.4th at 331 (agreeing with the trial court that determining the exempt nature of tasks "is an issue that can easily be resolved on a class-wide basis by assigning each task to one side of the 'ledger' and [thus that] the manageability of the case [was] not the daunting task Defendant has sought to portray"). On the other, where courts are confronted with the

---

[81]The court also noted that plaintiffs' proposed class did not exclude employees who were admittedly exempt, thereby allowing putative class members to "litigate inherently meritless claims through a representative action." *Vinole*, 2007 WL 4112195, at *4.

task of calculating the exempt portion of an employee's work on a case-by-case basis, they have refused to certify an exemption class. See, e.g., *Jimenez*, 238 F.R.D. at 253. Stated differently, courts have certified exemption classes where plaintiffs have been able to demonstrate that defendants have made a common mistake with respect to all putative class members (i.e., treating a non-exempt task as exempt).[82] Courts have declined to grant class certification, however, where defendants have adduced evidence that their exemption mistake was confined to individual employees or differed across the proposed class. How a particular case is decided is closely related to whether plaintiffs are challenging commonly applied policies or individual treatment. See *Kurihara*, 2007 WL 2501698 at *10. Stated differently, a class is generally certified only if plaintiffs challenge a blanket exemption on its merits rather than its individual application to specific employees. Considering the evidence adduced by the parties in this case, the court finds that plaintiffs have adequately demonstrated that their exempt status resulted from application of a common policy.

As noted, before it is proper to exempt employees from overtime compensation, they must perform "'office or non-manual work directly related to management policies or general business operations' of the employer or its customers." *Eicher*, 151 Cal.App.4th at 1372 (quoting 8 CAL. ADMIN. CODE § 11040). In *Eicher*, the court considered whether a consultant for a software company who provided customer service and training on specialized software was properly exempted from overtime compensation. It concluded that Eicher performed the core, day-to-day business of ABI – namely "implementing the ABI MasterMind product at customer venues and supporting the customers, whether at the customer venues or in the ABI office." *Id.* at 1373. The court noted that both California and federal authorities distinguished between administrative employees and production employees. See *id.* at 1372 (citing *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230 (5th Cir. 1990) and *Bell v. Farmers Ins.*

---

[82]In cases such as *Maddock* and *Vinole*, where the court found some element of "common mistake" in addition to the need for individualized inquiries, it also found that separate considerations militated against certification. As noted, the court in *Maddock*, determined that predominance was undermined by the fact that plaintiffs did not share a common employer. See *Maddock*, 2007 WL 2221030 at *15. In *Vinole*, the court noted that the putative class included a number of employees who were admittedly exempt and thus could not assert the non-exemption claim common to the remaining class members. See *Vinole*, 2007 WL 4112195 at *4.

*Exchange*, 87 Cal.App.4th 805, 817-18 (2001)). Under this administrative/production dichotomy, administrators are those who perform "work directly related to management policies or general business operations of [the] employer or [the] employer's customers." *Id.* (quoting *Dalheim*, 918 F.2d at 1230). "Employees engaged in an activity that constitutes the company's primary purpose[, by contrast,] are likely production workers." *Id.* at 1373 (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991). Even though Eicher was required to learn his customers' management policies and business operations in order to perform his work, the court held he was essentially a production employee because he performed the work ABI was hired to do for its customers. See *id.*

*Eicher* could be read as suggesting that none of the work performed by the information technology workers in this case is exempt because all class members perform "core" service work for which EDS is hired by its customers. It would be inappropriate for the court to decide this issue on the merits at this preliminary stage of the litigation. Nonetheless, *Eicher* supports plaintiffs' assertion that common issues predominate.

EDS has proffered evidence that each information technology worker is given a different set of responsibilities daily, and that some of the assigned tasks that may be exempt. Some information technology workers at Seaside, for example, are "team leads," who assign and coordinate work, communicate with EDS managers and communicate with clients about the provision of services.[83] Others provide high level problem-solving that requires the exercise of individual discretion and judgment.[84] Still others are involved in designing database architecture for clients – e.g., the customization of a database to meet DOD's needs.[85] At Rancho Cordova, some information technology workers serve as "technical leads," supervising the work of others and making recommendations as to overall project direction.[86] Others provide service delivery or technical delivery to state clients.[87]

---

[83]See Randall Decl., ¶¶ 21-22.

[84]*Id.*, ¶¶ 24-25.

[85]*Id*., ¶ 19.

[86]Quichocho Decl., ¶ 7

[87]Lohmann Decl., ¶¶ 5-6.

The pattern is the same across the state. Each information technology worker is assigned to a different project and performs different tasks on that project. Plaintiffs do not dispute that individual information technology workers perform different tasks. They argue, however, that there is a given universe of tasks, none of which falls within the administrative exemption. Viewing this contention in light of *Eicher*, plaintiffs' exemption claim is more similar to that in *Sav-On* than to the claim in *Jimenez*. Stated differently, plaintiffs' exemption claim questions whether certain tasks – or categories of tasks – are exempt. This is the kind of sweeping threshold question that courts have found justifies class treatment. See, e.g., See *Kurihara*, 2007 WL 2501698 at *10 (stating that courts' discomfort is "assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability").

Although EDS adduces a great deal of evidence regarding variations among individual employees' job responsibilities, its evidence does not demonstrate definitively that putative class members' duties constitute non-manual work directly related to the general business operations of the company's customers. See 8 CAL. ADMIN. CODE § 11040(1)(A)(2).[88] EDS's assertion that information technology workers perform varying tasks is not relevant unless some of the tasks they perform are exempt. The parties disagree as to whether they are. EDS has the burden of showing that its employees' job duties constitute exempt work. At this stage, it has not adequately made this showing.[89]

Should the court, at a later point, conclude that a portion of the duties performed by information technology workers are exempt, then some amount of individualized inquiry will likely be required. The court cannot presently determine, however, that either the quantum or the nature of the individual inquiries that may be required warrants denial of plaintiffs' motion for certification of an overtime class.

_____

[88]Under *Eicher*, the mere fact that an information technology worker performs tasks that are vital to the business operations of an EDS client would not establish that his work is "administrative." Tasks such as designing database architecture for clients may be vital to the business operations of the client, but may also be considered "an activity that constitutes [EDS's] primary purpose." *Eicher*, 151 Cal.App.4th at 1372. More significantly, although EDS asserts that these and other tasks are administrative, and although it may ultimately prevail in showing that this is so, this does not mean that there are no common legal questions.

[89]Should the evidence at some point demonstrate that this is true, EDS is entitled to bring the evidence forward to the court and ask that it decertify the overtime class.

Rather, on the record presently before the court, it appears the case presents a common question of law: whether software consultants working for a contractor who provides a service to customers are exempt when performing the work that constitutes that service.[90]

The other exemption on which EDS relies does not defeat predominance. EDS contends that some of its employees fall under the computer workers exemption. As noted, this exemption applies to workers in the software industry who are "primarily engaged in work that is intellectual or creative and that requires the exercise of discretion and independent judgment," see 8 CAL. ADMIN. CODE. § 11040(1)(A)(3)(h), and whose hourly rate of pay ("or the annualized full-time salary equivalent of that rate") is above a statutory threshold. CAL. LAB. CODE § 515.5(a)(4). The statutory threshold is adjusted annually "by an amount equal to the percentage increase in the California Consumer Price Index for Urban Wage Earners and Clerical Workers." *Id.*[91] EDS asserts that some portion of the putative class

---

[90]To the extent it is necessary to compute the time an individual employee spends on a given task or project, moreover, the time logs kept by EDS for at least some employees will provide a source for obtaining the information. (See Quichocho Decl., ¶ 9 ("EDS employees working on the Medi-Cal account typically record their time in a system known as Plan View"); Thierman Decl., Exh. G (Dwyre's detailed time logs showing both work hours and time spent on tasks).)

[91]Because it changes annually, the threshold for exemption is different in each year of the class period. The following chart shows the threshold rate for each year, together with an estimate of the yearly salary equivalent (hourly rate x 2,080 hours).

| Year | Hourly Rate | Salary Equivalent |
| --- | --- | --- |
| 2002 | $42.64 | $88,691.20 |
| 2003 | $43.58 | $90,648.40 |
| 2004 | $44.63 | $92,830.40 |
| 2005 | $45.84 | $95,347.20 |
| 2006 | $47.81 | $99,444.80 |
| 2007 | $49.77 | $103,521.60 |

See Division of Labor Standards Enforcement, "History Rate of Pay for Exemption for Computer Software Employee," February 1, 2007 (available at www.dir.ca.gov/dlse/LC515-5.pdf). Effective January 1, 2008, the California legislature has amended § 515.5 (a)(4) to lower the threshold hourly rate to $36.00 (salary equivalent $74,880). See CAL. LAB. CODE § 515.5 (a)(4); see also 2007 SB 929,

earned above the hourly threshold wage, and thus qualified for the exemption.[92]  Citing earlier arguments regarding the general exemption,[93] plaintiffs counter that putative class members were not engaged in work that was intellectual or creative and that required the exercise of discretion and independent judgment.[94]  EDS bears the burden of establishing that the exemption applies.  See *Sav-On*, 34 Cal.4th at 338.  While it has adduced evidence suggesting that information technology workers exercised discretion and independent judgment, it has failed, at least at this stage, to demonstrate that their work qualified as "creative or intellectual."  As relevant in assessing certification, because the question is common to the class, it weighs in favor of a finding of predominance.

In the event that the court finds that class members are exempt under Labor Code § 515.5(a)(4), individualized issues of fact will be relatively easily resolved.  EDS has acknowledged that its personnel records indicate that "several members" of the putative class earned more than the minimum hourly rate.[95]  As a result, the individualized inquiries do not predominate over common legal questions regarding the exercise of discretion and independent judgment, and the creativity and intellectual nature of the work.

### b.  Conclusion

EDS has raised serious issues regarding the fact that information technology workers' job responsibilities vary.  Despite these issues, the court concludes that common issues of fact and law predominate.  The underlying question in this case turns on whether certain types of job duties are

Legislative Counsel's Digest ("This bill would decrease the hourly rate of pay requirement for this exemption to not less than $36").

[92]Def.'s Opp. at 14.  EDS does not indicate what portion of the putative class may be covered by the exemption.  Dalton states only that "according to EDS' personnel and payroll records, there are several individuals" who earned enough to qualify for the exemption.  (Dalton Decl., ¶ 9.)

[93]See *id.*  None of these earlier arguments directly address the creative or intellectual nature of information technology workers' job responsibilities.

[94]Pl.'s Reply at 20.

[95]See Dalton Decl., ¶ 9. EDS's use of the word "several" indicates that the computer exemption will apply, if at all, only to a portion of the putative class.  As for the remaining class members, common legal questions concerning the applicability of the administrative exemption will continue to predominate.

exempt. EDS's uniform treatment of information technology workers "weighs heavily in favor of class certification." *In re Wells Fargo*, 2007 WL 3045994 at *11. The court agrees with other courts in this circuit that it is "manifestly disingenuous for a company to treat a class of employees as a homogenous group for the purposes of internal policies and compensation, and then assert that the same group is too diverse for class treatment in overtime litigation." *Id.*

EDS acknowledges that it treats workers in all four information technology job codes as exempt.[96] It has adduced no evidence that this decision was made on an individualized basis. To the extent that EDS believes it correctly classified all of the workers as exempt, it presumably relies on common facts or legal theories to justify that decision. The court will not allow EDS to treat information technology workers uniformly, and simultaneously contend that individualized inquiries preclude certification. Accordingly, the court finds that common issues of fact and law predominate and that plaintiffs' overtime class is properly certified under Rule 23(b)(3).

### 4. Superiority

"Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

On balance, these factors weigh in favor of certification. Plaintiffs argue that their claims are

---

[96]The fact that class members have been assigned one of four job codes does not mandate a different result. Plaintiffs assert that the work performed by information technology workers in each of the four job codes claim is not exempt. EDS has not sought to differentiate the tasks performed by employees in each job code, instead focusing on the broader claim that all information technology workers perform different tasks. Should it become apparent as the litigation progresses that different job codes give rise to different exemption arguments that may lead to materially different outcomes, defendant may raise the issue at that time.

the type that class members might not pursue individually and thus that they should be aggregated.[97] The court agrees. Each class member's damages will be limited to lost overtime pay over a four year period. Depending on the amount of overtime worked during that period, many class members' recovery may be sufficiently small that they would not have a compelling interest in controlling the prosecution of separate actions. See *Amchem Products*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"); *Chamberlain v. Ford Motor Co.*, 223 F.R.D. 524, 527 (N.D. Cal. 2004) ("Here, few potential class members could afford to undertake individual litigation against Ford to recover the relatively modest damages at issue. Therefore, in the absence of a class action, few class members would have any meaningful redress against Ford as a practical matter. A class action is the superior method of resolving this controversy").

EDS's argument against superiority is identical to its argument against predominance. EDS suggests that a class action is not the superior vehicle because individual class members will have to prove significant individual issues to establish their right to recover.[98] EDS relies on *Maddock*, where the court found that "a class action is improper where an individual class member would be compelled to try 'numerous and substantial issues to establish his or her right to recover individually, after liability to the class is established.'" *Maddock*, 2007 WL 2221030 at *16. In *Maddock*, the court addressed the superiority question by examining the manageability of the class. See *id.* ("The greater the number of individual issues to be litigated, the more difficult it will be for the court to manage the class action" (citation omitted)). It found that the class was inherently unmanageable because the individual issues predominated. Here, however, the court has found that individual issues *do not* predominate. Given this finding, *Maddock* suggests inferentially that a class action is the superior vehicle.

In employment cases, individual actions, whether administrative or civil, are often thwarted by employees' reluctance to challenge their employer. See *Wang*, 231 F.R.D. at 614 ("Proceeding by means of a class action avoids subjecting each employee to the risks associated with challenging an

---

[97]Pl.'s Mem. at 23.

[98]Def.'s Opp. at 23.

employer"); *St. Marie v. Eastern R.R. Ass'n*, 72 F.R.D. 443, 449 (S.D.N.Y. 1976) ("The risks entailed in suing one's employer are such that the few hardy souls who come forward should be permitted to speak for others when the vocal ones are otherwise fully qualified"), rev'd on other grounds, 650 F.2d 395 (2d Cir. 1981). Class actions in employment cases are thus viewed favorably. This is especially true given the remedial nature of the overtime law at issue in this case. For these reasons, the court concludes that plaintiffs have satisfied Rule 23(b)(3)'s superiority requirements.

### III. CONCLUSION

For the foregoing reasons, the court concludes that plaintiffs' proposed overtime class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3). Accordingly, the court grants plaintiffs' motion to certify such a class under Rule 23(b)(3). The court denies plaintiffs' motion for certification of an overtime class under Rule 23(b)(1) and Rule 23(b)(2). It also denies plaintiffs' motion – to the extent one was made – for certification of a rest breaks class.

DATED: January 7, 2007

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE